**The below described is SIGNED.**

(ts)

**Dated: July 18, 2005**    _____
_William J. Thurman_
**WILLIAM T. THURMAN**
**U.S. Bankruptcy Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| In re: | | Bankruptcy No. |
|---|---|---|
| **Alaina Hopkins**, | | 03-40481 |
| Debtor. | | Chapter 13 |

**MEMORANDUM DECISION**

This adversary proceeding[1] came on for trial on April 6th & 7th, 2005, and on May 11,

2005, before the Honorable William T. Thurman in room 376, United States Courthouse, 350

South Main Street, Salt Lake City, Utah.  Present at the hearing were Alan Smith, counsel for the

Debtor, Alaina Hopkins, and Dean A. Stuart, counsel for creditor Weber State Credit Union (the

"Credit Union").  Representations were made and arguments were had thereupon.  Based upon

the representations of counsel, the testimony of witnesses, the exhibits that were presented and

accepted into evidence, and the Court being fully advised in this case, the Court makes this

_____

[1] This matter was initiated by an objection to claim filed by the Debtor against the Credit
Union.  By order of the Court dated May 27, 2004, the Court deemed this an adversary
proceeding and required the parties to proceed with additional procedural requirements pursuant
to Bankruptcy Rule 9014.

Memorandum Decision, which will constitute its findings of fact and conclusions of law as
required by Rule 52 of the Federal Rules of Civil Procedure.[2]


## BACKGROUND

This proceeding revolves around whether the Credit Union retained a valid trust deed lien
on the Debtor's home following the foreclosure by the Credit Union on other real property
owned by the Debtor. A number of defenses have been presented by the Debtor.[3] In order to
analyze them in total, a history of the loan transactions between the Debtor and the Credit Union
is required.

In the late 1990s and early 2000, the Debtor's son, Drew Hopkins ("Drew"), was a
principal in a company known as Noble Built, Inc. ("Noble Built") that was developing a tract of
realty in Eden, Utah which is located northeast of Ogden, Utah. The development was known as
the Preserve at Sheep Creek ("The Preserve"). The realty had been subdivided and lots were
being placed on the market for sale. Noble Built wanted to build a model home at The Preserve
(the "Model Home") that could be used to illustrate excellence in their home construction and to
act as a marketing device in generating sales. Neither Noble Built nor Drew was able to get
financing for the Model Home.

In early 2000, Drew sought the assistance of his mother, Alaina Hopkins ("Alaina" or
"the Debtor"), to obtain financing for the construction of the Model Home. To help her son, the
Debtor obtained a loan from the Credit Union in the amount of $315,000 at 9.75% interest per

---

[2] Incorporated into the Bankruptcy Code via Bankruptcy Rule 7052.

[3] In addition to objections based upon state law, the Debtor filed an Objection to the
Proof of Claim based upon 11 U.S.C. §§ 502(b)(1), 544(b), 550, and 551.

2

annum.  The Note was secured by both the Model Home and the Debtor's home located in

Murray, Utah (the "Murray Home").  The Note came due as a balloon payment in December

2000.  The Debtor was unable to make that payment and, as a result, from December 2000 until

the fall of 2003 the Credit Union attempted to work out a satisfactory arrangement on the Note

with the Debtor and her attorney, but none could be agreed upon.  The Credit Union then began a

non-judicial foreclosure by issuing a Notice of Default under the trust deed on the Model Home

and the Murray Home in the fall of 2003.  The Debtor filed this bankruptcy case on December 2,

2003, staying the foreclosures.

The Credit Union moved for relief from the automatic stay on both the Model Home and

Murray Home following the filing of the Debtor's petition.  An order was entered allowing the

stay to be terminated with respect to the Model Home only on March 5, 2004.  The order

provided that all other issues regarding the Credit Unions's motion for relief from stay were

reserved for further proceedings.  Thereafter, a non-judicial foreclosure was completed by the

Credit Union on the Model Home on April 7, 2004, wherein it bought the Model Home for

$160,000.  The Credit Union then resold the Model Home on July 9, 2004 for $175,000.

Following that foreclosure sale, the Debtor sought a determination from this Court in a

motion for summary judgment that the entire obligation to the Credit Union was satisfied

because the Credit Union failed to comply with Utah's One Action Rule.[4]  That motion was

denied in a Memorandum Decision and accompanying Order entered September 22, 2004.

The original proof of claim filed by the Credit Union reflected a secured claim of

$438,396.01, with both the Model Home and the Murray Home listed as collateral.  Following

---

[4] Utah Code Ann. § 78-37-1 (2002).

the foreclosure by the Credit Union on the Model Home, the Credit Union did not amend its proof of claim.

At the time of the trial in this proceeding, the Credit Union asserted a total remaining claim deficiency of $301,183.90 after selling the Model Home.  The Credit Union arrived at this amount by taking the amount of all disbursements,[5] calculating interest accruals at 9.75% as per the Note, and subtracting from that total the sum of $171,518.12.  This latter figure was the amount that the Credit Union netted when it sold the Model Home after foreclosure.  At the trial, Mr. Cederholm testified that the Model Home sold for $175,000, and as such that amount was its fair market value.

At the inception of the trial in this proceeding, the Debtor moved for a directed verdict on the basis that the Court lacked jurisdiction.  Specifically, the Debtor argued that the Credit Union failed to commence an "action" on the deficiency following the foreclosure on the Model Home and that therefore the Credit Union was barred pursuant to state law from seeking to collect on any amount against the Debtor.  The Court took that motion under advisement and required the parties to proceed with the trial.

## JURISDICTION

The Debtor argues that the Court lacks jurisdiction and that the Credit Union's claim is barred as a result of Utah Code §57-1-32.  That sections states:

---

[5] Made by the Credit Union to Noble Built and to Southwick Development, the contractor who finished the work on the Model Home after Noble Built stopped construction.  See discussion infra pp. 13-14.

> At any time within three months after any sale of property under a trust deed as provided in Sections 57-1-23, 57-1-24, and 57-1-27, an action may be commenced to recover the balance due upon the obligation for which the trust deed was given as security, and in that action the complaint shall set forth the entire amount of the indebtedness that was secured by the trust deed, the amount for which the property was sold, and the fair market value of the property at the date of sale. Before rendering judgment, the court shall find the fair market value of the property at the date of sale. The court may not render judgment for more than the amount by which the amount of the indebtedness with interest, costs, and expenses of sale, including trustee's and attorney's fees, exceeds the fair market value of the property as of the date of the sale. In any action brought under this section, the prevailing party shall be entitled to collect its costs and reasonable attorney fees incurred.[6]

The Debtor's arguments regarding this section fail for several reasons:

First, the Court does not read this statute as a limitation on the Court's jurisdiction.  It is a substantive state law standard for determining claims.  Even if this Court finds that no claim exists as a result of its analysis of this state statute, § 57-1-32 would not strip the Court of its jurisdiction to make that determination.

Second, the Debtor argues that because the Credit Union failed to file a complaint or an amended proof of claim against the Debtor on the Murray Home within three months after foreclosing on the Model Home, the Credit Union failed to "commence an action" and its claim is barred.  This is not a jurisdictional argument, but rather a substantive argument that proper application of the statute to the facts of this case bars the Credit Union's claim.

Section 57-1-32 requires that any action to recover the balance due upon an obligation secured by a trust deed must be commenced within three months after any sale of property under a trust deed.  This three month time period is required to put the Debtor on notice that a

---

[6] Utah Code Ann. § 57-1-32 (2004).

5

deficiency will be sought.  The Utah Court of Appeals recently addressed this three month

window to commence an action in a guarantor case.[7]  Its analysis is limited to guarantors, but has

some application by analogy.  The Utah Court of Appeals held that, for purposes of providing

notice of the creditor's intent to collect on a deficiency, the filing of a lawsuit to recover the

deficiency prior to the actual foreclosure was sufficient.  Otherwise, the court noted, the creditor

would be required to serve "a second complaint, virtually identical to the first but for a few

discoverable facts and the word "deficiency.'"[8]  Although the Court concludes in this case that

the Debtor is not a guarantor,[9] the Court believes that the same reasoning that applies to a

guarantor should apply to the primary contracting party.  Here, an action was commenced by the

Credit Union when it filed its proof of claim and its motion for relief from stay relating to both

properties.  As in Fink, no additional action was necessary to put the Debtor on notice of the

creditor's intent to collect on the deficiency.

　　　Third, the filing of a bankruptcy petition acts as a stay to prevent actions by creditors

against the estate property or the Debtor.  As the Utah Supreme Court stated in a similar case:

> In the usual case, a plaintiff would have been free to file a deficiency action any
> time within three months following the trustee's sale.  However, by reason of the
> stay provisions of the Bankruptcy Code, creditors are precluded from instituting
> any action detrimental to the bankruptcy estate prior to termination or expiration
> of the stay.
> Section 108(c) of the Bankruptcy Code provides in plain, unequivocal language
> that a period of time fixed for commencing or continuing a civil action unrelated
> to the bankruptcy proceeding "does not expire until the later of--(1) the end of
> such period, including any suspension of such period occurring on or after the
> commencement of the case; or (2) 30 days after notice for termination or

---

[7] Machock v. Fink, 101 P.3d 404 (Utah Ct. App. 2004).

[8] Id. at 407.

[9] See discussion infra p.16.

expiration of the stay. . . ."  Because the petition in bankruptcy was filed prior to the time the deficiency action arose, application of alternative (2) would result in a shorter limitations period in this case.  Therefore, it is clear that alternative (1) applies as the later alternative, and since no part of the statutory three-month period provided for filing a deficiency claim had run prior to the filing of the petition in bankruptcy, plaintiff's deficiency action was timely filed.[10]

Although not binding precedent on this Court, the Citicorp Decision is persuasive and helpful on the issue of jurisdiction.  In this case, the Credit Union sought relief from the automatic stay as to both properties.  The Court entered an order on March 3, 2004 which stated the following:

IT IS HEREBY ORDERED:

1. Relief from the Automatic Stay is granted with respect to the property described as follows: All of Lot 54, Sheep Creek Cluster Subdivision Phase 1, Weber County, Utah, according to the official plat thereof.  Relief from the Stay is effective when ordered and shall not be stayed for any period of time.

2. All other issues regarding the credit union's Motion for Relief from the Automatic Stay with respect to the second property and the Debtor's Objection to the credit union's claim are reserved for further proceedings and a hearing on these matters is continued without date.

The Court limited the relief to the Model Home and reserved the other issues for further hearing.  The Credit Union's right to file a deficiency action would begin to run when the stay as to the Murray Home has been lifted.  Because the stay is still in effect, § 57-1-32 does not apply in this case to defeat the Credit Union's motion or divest this Court of jurisdiction.

Based on the foregoing analysis, the Court determines that it has jurisdiction over the parties and subject matter of this contested matter under 28 U.S.C. § 1334(b).  This is a core proceeding under 28 U.S.C. §157(b)(2)(G) and (K), and the Court has authority to enter a final order.  Venue is proper in the Central Division of the District of Utah under 28 U.S.C. § 1409.

---

[10] Citicorp Mortgage, Inc. v. Hardy, 834 P.2d 554 (Utah 1992).

7

**FINDINGS OF FACT**

In early 2000 Drew asked Alaina for her help in obtaining a loan so that his business could build a model home to help to sell other lots on The Preserve. He advised her that she would be the borrower for the loan, and to that end, he arranged for a construction loan from the Credit Union and long term financing through a mortgage broker. At that time Alaina was 58 years old, working in Salt Lake City as a manager at Usana Laboratories.[11]

The mortgage broker, Sun Valley, obtained a financial statement from Alaina after a telephone interview between herself and Karl Smith ("Smith"), an agent for Sun Valley. During the interview, the Debtor told Smith in that she made $30,000 per year. Smith prepared a financial statement based on that telephone interview and submitted it to the Credit Union. The financial statement represented in part that Alaina had monthly income of $8,200, which was inaccurate. The Debtor never saw the financial statement or the loan application that Smith prepared, nor did she ever sign them.

Smith then worked with Green Point Mortgage to help Alaina obtain long term financing on the Model Home. On March 10, 2000, the Debtor signed a Uniform Residential Loan Application (the "Loan Application") wherein she acknowledged and agreed that the statements made in the application were true and correct. Among the representations made in the Loan Application was her answer of "yes" to the question: "Do you intend to occupy the property as

---

[11] The Debtor's husband passed away two years prior to her son approaching her regarding financing for the Model Home. While her husband was alive, Alaina relied heavily on his advice and direction in financial matters. She likewise relied heavily on Drew for advice on financial matters, including the financial arrangements for the acquisition and development of the Model Home. At trial, however, Alaina appeared to the Court to be intelligent and capable of making financial decisions.

your primary residence?" She certified that the information she provided was true and correct as

of the date that it was signed and that she did not make any intentional or negligent

misrepresentations of the information contained in the application. Based upon the Loan

Application, Alaina obtained long-term financing to be secured by the Model Home.

On March 15, 2000, the Debtor accepted a proposal from Noble Built, Inc. to purchase

building lot number 54 at The Preserve.[12] The proposal set forth a cost breakdown for the

purchase of the lot and the itemized costs of the construction and improvements. The total

proposed contract amount was $305,000.00. The Debtor signed the "Acceptance of Proposal

and Authorization to Proceed," which stated the following: "The above prices, specifications and

conditions are satisfactory and are hereby accepted. You are authorized to complete this contract

as specified to the terms on the reverse."

After negotiating a long term financing arrangement between the Debtor and Greenpoint

Mortgage, Smith brought the loan package including the approval for the long-term financing to

Dale Thorne ("Thorne"), a loan officer at the Credit Union, to see if the Credit Union would be

interested in providing the construction lending for the project.[13] It was the policy of the Credit

Union at the time that this loan transaction took place to provide construction financing on

residences only when approval for long-term financing was already in place. In this case, the

long-term financing had been approved through Sun Valley Mortgage as the broker for the

lender. The Credit Union, relying upon the Loan Application and other documents in the loan

---

[12] This is the location of the Model Home.

[13] Greenpoint Mortgage provided a loan commitment for long term financing. It was not
signed by a representative of Greenpoint; however, the evidence indicates that Greenpoint does
not generally sign these, but instead provides them on its letterhead. The Court finds that the
Credit Union reasonably relied upon that document.

package provided by Sun Valley Mortgage, approved the construction loan in the amount of

$315,000.00.  The Credit Union was not aware that the property was to be used as a model

home.  The loan closing took place on March 22, 2000 at the offices of the Credit Union.  The

Debtor, Thorne, and a representative of Noble Built attended the closing.  At the closing Noble

Built delivered a signed warranty deed for the Model Home to the Debtor.  The Debtor then

signed the following documents:[14]

1. Federal Truth-in-Lending Disclosure Statement

2. Special Occupancy Statement

3. Weber State Credit Union–Right of Rescission

4. Itemization of Amounts Financed

5. Borrower's Certification and Authorization

6. HUD1A Settlement Statement

7. Note

8. Deed of Trust–Model Home

9. Deed of Trust–Murray Home

At the closing, Thorne explained what each of the documents were and answered any questions

that the Debtor had.

Pursuant to the terms of the Note, the Debtor agreed to pay the Credit Union the sum of

$315,000.00 plus interest at 9.75%.  The loan was to be repaid with interest in a balloon payment

due on December 20, 2000.  The Note also provided for penalties in the event of a default.  The

---

[14] The Debtor acknowledges that these were all presented to her at the closing by the
Credit Union and that she signed all of them, but did not read them in detail.

Debtor defaulted on the Note by failing to make the required payment of principal and interest

on December 20, 2000.

One of the documents the Debtor signed at closing was the Deed of Trust on her home in

Murray, Utah.  She was not aware of the need for this document before going to the closing.  She

nonetheless signed that document.  Following the closing, she immediately called Drew and

asked why her Murray Home was included as collateral in this financial arrangement.  Drew

advised her that there was nothing to worry about because the construction loan would be paid

off shortly.  He advised her that she was only a secondary person on the loan.  In reliance on that

representation, the Debtor did not concern herself with her personal responsibility to pay back

the Note to the Credit Union, nor did she concern herself that she could possibly lose the Murray

Home if the Note was not paid off.  For the same reason, the Debtor did not notify the Credit

Union of any request for recission during the allotted time period.

The Debtor relied on Drew's advice that her name would be on the  deed as owner only

to allow the construction to proceed; that she was only to be the owner temporarily; that as soon

as the Model Home was built other lots in the subdivision would begin to sell; that from those

sale proceeds the construction loan on the Model Home would be paid off; and accordingly, that

she had nothing to worry about.  Based primarily on her reliance on Drew's advice, the Debtor

proceeded with the closing with the Credit Union and did not carefully read all of the documents

she signed, or if she did, she ignored their meaning.

Noble Built and Drew commenced construction on the Model Home shortly after the

closing.  The Credit Union monitored the construction and required draw requests from Noble

Built for each disbursement.  These draw requests required an itemization of costs incurred,

copies of receipts or purchase orders from vendors, and a tally of the funds requested.  As those were received by Thorne at the Credit Union, he would authorize disbursements as set forth in the draw requests.  Each draw request required the signature of the Debtor.

The Debtor signed a blank draw request form at the closing with the Credit Union and delivered it to Noble Built.  Noble Built took that document and duplicated it a number of times and used the copies with the Debtor's signature and filled in subsequent draw requests.  The Credit Union did not object to the use of these duplicated signature forms, but may not have noted that it was identical on each draw request, only that it contained the Debtor's signature. The Debtor was not consulted regarding any of the draw requests made by Noble Built, never visited the site of the Model Home, and did not know specifically where the Model Home was to be built.  In fact, the Court finds that the Debtor never had any intention of moving into the Model Home.

Following the closing, Thorne visited the construction project of the Model Home and noted its progress.  He did not perform any type of audit to see that the funds actually disbursed went into the Model Home.  The construction proceeded and the Model Home started to take shape during the spring and summer of 2000.

During the fall of 2000, Noble Built could not meet the financial demands on it for development of the other properties at The Preserve.  It had taken upon itself a large development obligation and began to default on it.  Other lots in the subdivision were not selling and Noble Built closed down its operations.  Drew advised the Credit Union that Noble Built could no longer be responsible for the remaining construction of the Model Home in November, 2000.  The last draw request submitted by Noble Built was on November 17, 2000.

12

The Credit Union contacted the Debtor in December, 2000 and advised her that the Note was due and gave her the calculations for the payoff. The Credit Union provided the Debtor with opportunities to sell the property or otherwise satisfy the obligation that she had to the Credit Union. The Debtor did not comply with the Credit Union's requests and did not make any payments on the loan or make any efforts to sell the property.

Due to the Debtor's and Noble Built's inattention to completing or selling the Model Home, the Credit Union arranged for another builder, Paul Southwick and/or Southwick Development ("Southwick"), to bring the home to a point that it could be winterized. This was accomplished sometime following December, 2000.

Later, Southwick provided bids for completing the Model Home in the total amount of $54,650.[15] The Credit Union accepted Southwick's bids, who then commenced its construction on the Model Home and thereafter submitted draw requests on his own letterhead. The draw requests do not contain the signature of the Debtor. In one instance, the draw requests contained draw amounts that had been paid previously by Noble Built, including payments to the local county for fees and costs. Southwick did its last work on the Model Home through its several subcontractors in April, 2002.

The Credit Union did not ask for or obtain the consent of the Debtor in allowing Southwick to complete the construction of the Model Home. Southwick did not sign any loan agreement with the Credit Union, nor did it obtain approval from Noble Built or the Debtor for

---

[15] This consisted of 2 bids: one for $34,200 dated October 30, 2001, and one for $20,450 dated September 6, 2001. See Plaintiff's Exhibits T and U.

13

commencing construction on the Model Home.  The Credit Union performed no audit on the draw requests submitted by Southwick, but paid all of them.

Exhibits 68 through 103 reflect the various amounts of disbursements on the Model Home by the Credit Union.  The total amount expended by the Credit Union for all construction on the Model Home was \$336,037.18.[16]  The amount disbursed while Noble Built was the contractor was \$257,004, which brought the home to 60% completion.[17]

Southwick's bid of \$54,650 to complete the construction of the Model Home along with the previously expended \$257,004 totaled less than the original loan amount of \$315,000. Southwick, however, apparently under-estimated the necessary costs to finish the Model Home. As a result, the total amount disbursed by the Credit Union on the construction loan exceeded the contracted loan amount by \$19,927.25.[18]  The draw requests submitted by Southwick contained only Southwick's summary of expenses without attaching copies of invoices of other evidence of billings or payment to or from subcontractors.  This procedure was different from the procedure required by the Credit Union in dealing with Noble Built.

After the stay was lifted on the Model Home, the Credit Union listed the property for sale and received \$175,000 as its purchase price.  The Credit Union now asserts a remaining claim on the Murray Home for the balance due after application of the sales proceeds from the Model Home.

---

[16] See Plaintiff's Exhibit W, which consists of the Credit Union's running account on this loan, not including interest.

[17] See Defendant's Exhibit 95.

[18] This is calculated by subtracting the contracted loan amount of \$315,000 from the total disbursements of \$334,927.95.

14

## ANALYSIS

A proof of claim constitutes prima facie evidence of the validity and amount of the

claim.[19]  The Court determines that the Credit Union filed a valid proof of claim pursuant to 11

U.S.C. § 501.  The Debtor has the burden to prove by preponderance of the evidence that the

Court should sustain her objections to the Proof of Claim filed by the Credit Union.[20]  If the

Debtor meets this burden then the Credit Union bears the ultimate burden of supporting its claim

by a preponderance of the evidence.[21]


 11 U.S.C. § 502(b)(1)

Section 502(b) states in relevant part:

If [an] objection to a claim is made, the court, after notice and a hearing, shall
determine the amount of such claim in lawful currency of the United States as of
the date of the filing of the petition, and shall allow such claim in such amount,
except to the extent that
(1) such claim is unenforceable against the debtor and property of the debtor,
under any agreement or applicable law for a reason other than because such claim
is contingent or unmatured.[22]

The Debtor claims that the Credit Union's claim is unenforceable because the transaction created

a suretyship or guaranty relationship which has been exonerated.  Debtor also argues that the

Credit Union's claim is unenforceable because of equitable estoppel, negligent

misrepresentation, illegality, waiver, and laches.

---

[19] Bankruptcy Rule 3001(f) (2004).

[20] Raleigh v. Ill. Dep't. of Revenue, 530 U.S. 15 (2000).

[21] In re Harrison, 987 F.2d 677 (10th Cir. 1993).  Perry v. First Citizens Fed. Credit
Union, 304 B.R. 14, 23 (D. Mass. 1994) aff'd 391 F.3d 282 (1st Cir. 2004).

[22] 11 U.S.C. § 502(b)(1) (2005).

Suretyship and/or Guaranty

A suretyship is defined as a contractual relationship in which one party engages to be answerable for the debt or default of another.[23]  A guaranty is "a promise to answer for the payment of some debt, or the performance of some duty, in case of the failure of another who is liable in the first instance."[24]

The facts established at trial do not support a suretyship or guaranty relationship.  Debtor Alaina Hopkins was the sole borrower under all of the terms of the loan documents.  The documents she signed warranted that she was the owner of the property and that she was obligated to repay the debt.  She also signed two trust deeds pledging two pieces of property that she owned as collateral for the debt.  The debt was her own, and no one else's.  Even if she were a surety or guarantor, the note which she signed states, "Any person who is a guarantor, surety or endorser of this note is also obligated to do these things."  Debtor's transaction with the Credit Union did not create a suretyship or a guaranty relationship.  It created a binding contact, entered into by two independent parties at arms length.  Because the Court finds that no suretyship or guaranty relationship existed, it need not consider the Debtor's argument regarding exoneration.


Equitable Estoppel

The elements essential to invoke the doctrine of equitable estoppel are:

(1) an admission, statement, or act inconsistent with the claim afterwards asserted,
(2) action by the other party on the faith of such admission, statement, or act, and

---

[23] Hermes Assoc. v. Park's Sportsman, 813 P.2d 1221, 1223 (Utah Ct. App. 1991).

[24] Black's Law Dictionary 712 (7th ed. 1999).

16

(3) injury to such other party resulting from allowing the first party to contradict
or repudiate such admission, statement, or act.[25]

The facts at trial lead to the conclusion that this was a loan transaction into which the Debtor

voluntarily entered.  She understood that she was granting the Credit Union a trust deed security

interest in her Murray Home.  She willingly did this to help her son who was developing real

estate and in need of her assistance.  Consideration for the transaction existed because: 1) Alaina

wanted to assist her son; 2) Alaina received title to the Model Home; and 3) the loan proceeds

from the Credit Union went into the construction of the Model Home.  The Credit Union claims

that the Debtor defaulted on her Note and, having foreclosed on the first property securing the

Note at a deficit, the Credit Union is entitled to foreclose on the second property securing the

Note, the Murray Home.

The evidence does not support the Debtor's claim that the Credit Union made any

admission, statement, or act inconsistent with a claim later asserted by the Credit Union.  The

Debtor did not change her position based upon any inconsistent act by the Credit Union.  The

Credit Union did not take any action detrimental to the Debtor that was inconsistent with the

rights given to the Credit Union by the Debtor.  The Debtor obtained a loan for the terms she

requested.  The Credit Union did not treat her in any way other than as an owner of property who

had assigned the property to the Credit Union as security for a loan.  She agreed to complete

construction and pay off the loan.  She defaulted on her agreements with the Credit Union.  It

appears that the Credit Union treated her as it would any other borrower with a construction loan

---

[25] Celebrity Club, Inc. v. Utah Liquor Control Comm'n, 602 P.2d 689, 694 (Utah 1979).

in default.  This case does not present any facts that would lend themselves to the conclusion that

the Credit Union should be estopped from asserting a valid, secured claim against the Debtor.


Negligent Misrepresentation

        In order to prevail in an action for negligent misrepresentation, a party must identify a

"representor [who] makes an affirmative assertion which is false without having used reasonable

diligence or competence in ascertaining the verity of the assertion."[26]  In this case the Credit

Union had a duty to disclose certain aspects of the loan transaction to the Debtor as required by

federal law in connection with a residential loan transaction.  These disclosures were made by

the Credit Union.  Evidence presented at trial shows that the Credit Union explained all of the

documents to the Debtor at the closing.  The Credit Union explained the transaction and

answered her questions.  There is no evidence that the Credit Union misrepresented any facts or

had a duty to disclose facts that were not disclosed.  There was no misrepresentation of any kind

on behalf of the Credit Union.  If anything, the Debtor's son misrepresented the terms of the loan

to the Debtor.  But the Credit Union is not responsible for any mis-information given by Drew to

Alaina, as Drew is not an agent for the Credit Union.  The Credit Union accurately disclosed all

terms of the loan, and therefore it did not make any negligent misrepresentations.4


Illegality

        The Debtor argues that the transaction is void because of illegality.  For a defense of

illegality to be upheld there has to be some act on behalf of the Credit Union that was illegal.

---

        [26] Ellis v. Hale, 373 P.2d 382, 385 (Utah 1962).

The Debtor has not identified any illegal act by the Credit Union.  The facts do not show that the

Credit Union acted illegally in any aspect of the transaction and therefore the defense of

illegality is without merit.


Waiver

Waiver is "the voluntary relinquishment or abandonment–express or implied–of a legal

right or advantage."[27]  Although a waiver may be either express or implied, it must be "distinctly

made."[28]  In this case, the Credit Union has done nothing to either explicitly or implicitly waive

its claim against the Debtor and waive the liens securing the debt.  In addition, the Note signed

by the Debtor states in Paragraph 6.(D) that "[e]ven if, at a time when I am in default, the Note

Holder does not require me to pay immediately in full as described above, the Note Holder will

still have the right to do so if I am in default at a later time."  The evidence does not support the

Debtor's claim that the Credit Union made any statement or acted in a manner that would

constitute a waiver of its claim against the Debtor.  The Credit Union never took action that

could be construed as an intent to relinquish its trust deeds securing the claim.  The written

communication between the parties indicates that just the opposite is true.  Waiver is not a valid

defense to the credit union's claim.

---

[27] Black's Law Dictionary 1574 (7th ed. 1999).

[28] Geisdorf v. Doughty, 972 P.2d 67, 72 (Utah 1998).

19

Laches

      The doctrine of laches is "based upon the maxim that equity aids the vigilant and not those who slumber on their rights."[29]  As stated previously, the Credit Union did not unduly delay an action against the Debtor.  It has actively pursued the Debtor since the Note became due in December 2000.  The Credit Union considered workout proposals by the Debtor and should not be prejudiced for the delay to which those negotiations contributed.[30]  Likewise, the Credit Union cannot be faulted because the Debtor filed bankruptcy and the Credit Union adjusted its procedures to address the bankruptcy laws.  Accordingly, laches does not apply in this case.

Fraudulent Transfer Act

      Utah has adopted the Uniform Fraudulent Transfer Act (the "UFTA").[31]  The UFTA, which provides remedies for creditors when debtors transfer property fraudulently, has no application in this case.  The UFTA does not give the Debtor the right to claim that her transfer of an interest in property to the Credit Union was fraudulent as to herself.  The purpose of the UFTA is not to allow the Debtor to avoid valid claims made against her.  Such a claim is not supported by the UFTA and fails.

---

[29] CIG Exploration, Inc. v. State, 24 P.3d 966 (Utah 2001) (quoting Black's Law Dictionary, 787 (6th ed. 1990)).

[30] Defendant's Exhibits 27-33 are a series of letters between the Debtor's attorney and the Credit Union reflecting an intent to seek a compromise.

[31] See Utah Code Ann. § 25-6-1 et. seq.

The Anti-deficiency Statute

In addition to affecting jurisdiction, § 57-1-32 requires that the Court determine the fair

market value of a property at the date of its sale before a judgment for any deficiency is rendered

after the sale.  The court may not render judgment for more than the total indebtedness exceeding

the fair market value.  Hence, this section is often referred to as an Anti-deficiency Statute.  It is

intended to insure that bidding generates the most for the property subject to sale and guards

against artificially low bids.

Two issues concern the Court in this case: 1) what is the amount of the indebtedness with

interest, costs and expenses of sale, including trustee's and attorneys's fees?; and 2) what is the

fair market value of the Model Home?  The Court is concerned about including the costs of

Southwick when determining the amount of the indebtedness.  The Credit Union claims those

costs should be included pursuant to paragraph 7 of its Trust Deed, which provides:

> If Borrower fails to perform the covenants and agreements contained in this
> Security Instrument, or there is a legal proceeding that may significantly affect
> Lender's rights in the Property (such as a bankruptcy, probate, for condemnation
> or forfeiture or to enforce laws or regulations), then lender may do and pay for
> whatever is necessary to protect the value of the Property and Lender's rights in
> the Property.
> Any amounts disbursed by Lender under this paragraph 7 shall become additional
> debt of Borrower secured by this Security Instrument.  Unless Borrower and
> Lender agree to other terms of payment, these amounts shall bear interest from
> the date of disbursement at th e Note rate and shall be payable, with interest, upon
> notice from Lender to Borrower requesting payment.[32]

The Debtor clearly failed to perform pursuant to the covenants and agreements in the Trust Deed

by failing to pay for the Note.  Accordingly, the Credit Union hired Southwick to do the

winterization and final construction on the property.  Although the Credit Union did not follow

---

[32] Defendant's Exhibit 19.

21

the same procedures as it required of the Debtor when disbursing funds, the Debtor had already agreed by signing the Trust Deed that the Credit Union could proceed as it did when the Debtor failed to pay. As a result, the Court finds that the Southwick expenses may be added to the total indebtedness.

The question, therefore, is whether all of Southwick's invoices were "necessary to protect the value of the Property and Lender's rights in the Property." On November 29, 2001, Southwick billed the Credit Union $3,000 relating to "4 Way."[33] Southwick billed the Credit Union an additional $500 on March 29, 2002 for "4 Way."[34] Noble Built invoiced the Credit Union $4,000 on March 22, 2000 for charges relating to "Weber County Permits & Fees."[35] The evidence presented at trial leads the Court to find that the $3,500 charged by Southwick for "4 Way" was included in and duplicative of that charged by Noble Built for Weber County Permits & Fees. Accordingly, the total debt owed to the Credit Union should be reduced by $3,500. No other duplicative or unreasonable charges are found by the Court.

As to the fair market value of the property sold, i.e. the Model Home, the only evidence that the Court has is the testimony of Mr. Glen Cederholm, who testified that the home sold for $175,000. Mr. Cederholm is a vice president of the Credit Union with responsibilities over lending and collections.

The Debtor objected to the Credit Union's attempt to present any evidence regarding the fair market value of the property. She claimed that pursuant to the Pre-Trial Order, issues

---

[33] Plaintiff's Exhibit O.

[34] Plaintiff's Exhibit Q

[35] Plaintiff's Exhibit A.

22

relating to fair market value of the property were not identified for trial and that it would be

prejudicial to receive evidence of the same.  The Pre-Trial Order identifies Contested Issues of

Law at paragraph 6.b. as "Whether the facts lead to the conclusion that the credit union is

prevented from enforcing its rights against the Debtor because of waiver, laches, estoppel,

illegality, negligent misrepresentation, fraudulent transfer law, or anti-deficiency law."

The Court concludes that paragraph 6.b. of the Pre-Trial Order is broad enough to raise

the issue of fair market value for trial because under § 57-1-32 deficiency is tied to a requirement

of finding the fair market value.  Accordingly, the issue of fair market value was properly before

the Court and evidence could properly be presented.  The Court notes that although the Debtor

successfully objected to some evidence on value that Mr. Cederholm attempted to present, Mr.

Cederholm is an officer of the Credit Union and is qualified to render an opinion as an owner

without reference to any appraisals.[36]  The testimony of Mr. Cederholm, therefore, was sufficient

to establish the fair market value of the Model Home.  The Court finds the fair market value to

be $175,000.  No other evidence was presented regarding the fair market value of the Model

Home.


Other Issues

The Debtor also cites Sections 502, 544, 550, and 551 to support her objections.  Those

sections of the Bankruptcy Code have limited application to allow the Court to avoid liens or to

invalidate claims based upon law other than bankruptcy law.  None of these sections apply in

---

[36] United States v. 10,031.98 Acres of Land, 850 F.2d 634 (10th Cir. 1988); South
Central Livestock Dealers, Inc., v. Security State Bank of Hedley, Tex., 614 F.2d 1056, 1061-62
(5th Cir. 1980).

23

this case because the state law claims all fail as set forth previously.  The Court has reviewed all

other objections raised by the Debtor including the defense of lack of consideration and unclean

hands.  The Court finds and concludes that there was consideration for this transaction because

the Debtor was entering into a transaction at the request of her son and she wanted to help him in

his venture.  No profit or benefit to her is needed beyond her intent and desire to help her son.

The Court further finds and concludes that the Credit Union did not have unclean hands in the

manner in which it handled this transaction.  This transaction was a standard loan transaction and

there was no deceit or unconscionable conduct on the part of the Credit Union.

## CONCLUSION

Based upon the foregoing, the Court concludes that the Credit Union has a valid claim

against the Debtor after the application of the proceeds from the sale of the Model Home which

remains secured, at least in part,[37] by the Murray Home.  The total amount owed to the Credit

Union, and allowed as its claim, is $333,568.47.[38]  A separate order will follow.

_____ END OF DOCUMENT_____

---

[37] Evidence suggests that the Murray Home has a fair market value of approximately
$185,000.  The Credit Union's claim is secured for the full amount of value of the Murray
Home; any deficit will become an unsecured claim of the Credit Union.

[38] This amount was calculated by adding 9.75% interest to the total amount expended by
the Credit Union on a per diem basis, beginning on March 22, 2000, and ending on July 13,
2005.  In the calculations, the Court subtracted $3,000 from the November 29, 2001 expenditures
and $500 from the March 29, 2002 expenditures to account for Southwick's duplicative charges.
In addition, the Court subtracted $160,000 from the principal amount owed on April 7, 2004 to
reflect the Credit Union's bid on the Model Home, and $15,000 for the resale of the Model
Home on July 9, 2004.  The amount of the deficiency may need to be reduced pursuant to §
506(b) if the value of the collateral was equal to or less than the total claim as of the date of the
petition.

24

__oo00oo__

## SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION** will be effected through the

Bankruptcy Noticing Center to each party listed below.

Dean A. Stuart
1805 South Redwood Road
P.O. Box 25786
Salt Lake City, UT 84125-0786

Alan L. Smith
1492 Kensington Avenue
Salt Lake City, UT 84105

Kevin R. Anderson
32 Exchange Place
Suite 600                      \
Salt Lake City, UT 84111